UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

ANTONIO LUCAS                    :
                                 :
                                 :
v.                               :    CIV. NO. 3:08CV480 (HBF)
                                 :
                                 :
JOHN POTTER, POSTMASTER          :
GENERAL OF THE UNITED STATES     :
POSTAL SERVICE                   :

RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Antonio Lucas, brought this action against his former employer, Postmaster General John E. Potter, alleging that the Postal Service discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII"), on the basis of his race (African-American) and color (black), retaliated against him based on a protected activity and constructively discharged him. For the reasons that follow, the Postal Service's Motion for Summary Judgment **[Doc. #20]** is **GRANTED.**

STANDARD OF LAW

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, see Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242,

1

255 (1986); <u>Holcomb v. Iona College</u>, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." <u>Id.</u> In short, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." <u>Anderson</u>, 477 U.S. at 249-50 (citations omitted).  A party may not create a genuine issue of material fact simply by presenting contradictory or unsupported statements. <u>See</u> <u>SEC v. Research Automation Corp.</u>, 585 F.2d 31, 33 (2d Cir. 1978). Nor may he rest on "allegations or denials" contained in his pleadings. <u>Goenaga v. March of Dimes Birth Defects Found.</u>, 51 F.3d 14, 18 (2d Cir. 1995). A self-serving affidavit that simply reiterates the conclusory allegations of the complaint without other support is insufficient to raise a genuine issue of material fact. <u>See</u> <u>Lujan v. Nat'l Wildlife Fed'n</u>, 497 U.S. 871, 888 (1990).

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show

discrimination.' " <u>Schwapp v. Town of Avon</u>, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted) (quoting <u>Gallo v. Prudential Residential Servs.</u>, 22 F.3d 1219, 1224 (2d Cir. 1994)). However, "[s]ummary judgment is appropriate even in discrimination cases," <u>Weinstock v. Columbia Univ.</u>, 224 F.3d 33, 41 (2d Cir. 2000), where a plaintiff's argument is "based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct, . . ." <u>Tojzan v. N.Y. Presbyterian Hosp.</u>, No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *4 (S.D.N.Y. March 31, 2003).

Finally, the Second Circuit has recognized that even in fact-specific discrimination cases, summary judgment may be appropriate. <u>Abo-Brisson v. Delta Airlines, Inc.</u>, 239 F.3d 456, 466 (2d Cir. 2001). The advantageous purpose of summary judgment - to avoid "protracted, expensive and harassing trials" based upon factually unsupported claims - is at least as relevant in the context of discrimination cases as those involving other ultimate questions of fact, and discrimination claims should not be barred from summary judgment to achieve those ends. <u>Id.</u>; <u>see</u> <u>Celotex</u>, 477 U.S. at 323-24.


<u>BACKGROUND</u>

The following facts are offered by defendant as background facts and are not findings based on the parties' Local 56(a) Statements.

Lucas worked as a mail handler in the Postal Service's

Hartford Processing and Distribution Center ("P&DC").  In 2003 he was injured at work and subsequently given limited duty assignments. The Postal Service offered him a modified assignment-limited duty position on January 19, 2007.  Lucas accepted the position.

The Postal Service's Injury Compensation Unit monitors individuals in limited duty positions.  Injury Compensation will request that the employee's manager ask the employee for updated medical information on a Form CA-17. A Form CA-17 is required every 30 days.  Although management will actually request the form from the employee, it is at the behest of Injury Compensation.

Lucas' direct supervisor, or pay location supervisor, was Mildred Evans. Evans was a Manager of Distribution Operations ("MDO"). At times Lucas interacted with a floating Supervisor of Distribution Operations ("SDO"), Joe McDonald. On the weekends, McDonald was an acting MDO. Lucas also interacted with acting SDO Nina Bravo. Evans, McDonald, and Bravo ultimately reported to Rick Liburd, the lead MDO.

In July of 2007, Lucas had various disputes with Evans, Bravo, McDonald, and Liburd. These disputes largely centered around two issues: (1) where Lucas would work and what he was physically able to do and (2) Lucas' failure to provide medical documentation. On July 20, 2007, Lucas left work. Although he visited the P&DC at times, notably on October 16, 2007, when Evans asked him for information, he never worked again after July

4

20, 2007. He resigned from the Postal Service on January 17, 2008.


FINDINGS OF FACT

    Based on the parties' Local Rule 56(a) Statements, summary judgment briefs, and the exhibits provided, the following facts are undisputed.[1]

    A.   Plaintiff's Work History

    Plaintiff's color is black and his race is African-American. Doc. #20; Def. 56(a)(1) Stat. ¶1.  He worked for the United States' Postal Service as a mail handler at the Hartford Processing & Distribution Center ("PD&C"). Id. at ¶2. In this

---

[1]Plaintiff denies paragraphs 20, 21, 31 and 32 of defendant's Local Rule 56(a)(1) Statement. [Doc. #20]. However, plaintiff has not supported his denials of paragraphs 31 and 32 with evidence.

    Local Rule 56(a)(3) state, in relevant part, "each denial in an opponent's Local Rule 56(a)(2) statement, must be followed by a specific citation to (1) the affidavit of a witness competent to testify as to the facts at trial and/or (2) evidence that would be admissible at trial."  D. Conn. L. Civ. R. 56(a)(3).

        Counsel and pro se parties are hereby
        notified that failure to provide specific
        citations to evidence in the records as
        required by this Local Rule may result in the
        Court deeming certain facts that are
        supported by the evidence admitted in
        accordance with Rule 56(a)(1) or in the Court
        imposing sanctions, including . . . when the
        opponent fails to comply, an order granting
        the motion if the undisputed facts show that
        the movant is entitled to judgment as a
        matter of law.

D. Conn. L. Civ. R. 56(a)(3).

position, he was directly supervised by Mildred Evans, who is the same color and race as plaintiff. Id. at ¶3. Evans is a Manager of Distribution Operations at the Hartford PD&C, and she was plaintiff's pay location supervisor. Id. at ¶¶3-4.

Joe McDonald was a Supervisor of Distribution Operations at the Hartford PD&C. On the weekends he worked as an acting Manager of Distribution Operations. His color is white and his race is Caucasian. Id. at ¶5. McDonald was not Lucas' pay location supervisor. McDonald was a floating supervisor and would only interact with Lucas when McDonald happened to be "floating" that area. Id. at ¶6. McDonald was aware that Lucas was on a light duty job. Id. at ¶7. He did not interact with Lucas out of work. Id. at ¶8.

Plaintiff also worked with Kenrick "Rick" Liburd, who was Manager of Distribution Operations at the Hartford PD&C, and Nina Bravo, a.k.a. Alicia Michalick, who was a clerk and 204B, or acting Supervisor of Distribution Operations, at the Hartford PD&C. Id. at ¶¶9-10. Liburd is the same race and color as Lucas. Id. at ¶9. Nina Bravo's color is white/olive and her race is Hispanic and Peruvian. Id. at ¶10.

Lucas alleges that, "[b]y way of historical context," on March 2, 2003, after Lucas injured himself at work, McDonald took him to the emergency room. During that trip, Lucas alleges that McDonald said to him, "We are only going to East Hartford, don't you and your boys jump me." Id. at ¶11. McDonald denied making this statement. Id. at ¶12. Lucas admitted at his deposition that

he could not recall ever reporting this statement to management. Id. at ¶13. Although Lucas contends that McDonald harassed him, he was unable to recall any other specific incidents of harassment outside of the East Hartford statement. Id. at ¶14.

Lucas maintains that his supervisors got upset when he would tell them about his restrictions after they asked him to work in the automated induction area, commonly referred to as AI. Id. at ¶15. Lucas was asked at his deposition, "Now, can you remember any specific instance where you had told them about [your] restrictions and they got upset with you, either Rick or Joe. I think you said. Rick, Joe, and Mildred actually, so . . ." and he answered, "Not specifically. I don't recall any specific time. Don't recall." Id. at ¶16.

B.   July 16, 2007

Lucas alleges that on July 16, 2007, McDonald approached him from behind and shoved a letter containing his medical restrictions in front of him, saying "[Y]ou can work in AI." Lucas alleges that this was hostile and aggressive. Id. at ¶17. Lucas' modified assignment permitted him to work in AI. Id. at ¶18. Lucas explained why he believed this incident was hostile and aggressive: "The MDO office is across the aisle slightly from rewrap. Mr. McDonald approached me from behind. I'm facing this (indicating) way. He approached me from behind, shoved a document - reached over my shoulder, shoved the document in front of me." Id. at ¶19.  McDonald testified that on that day, he "went to the office to find that letter. I was MDO that day. I went to the

7

office to find that letter. I found the letter, I made a copy of it and I brought it to him. He was sitting at a desk with his back to me, and I just laid it on the desk. I said. here is the letter." <u>Id.</u> at ¶19; Def. Exh. 4, p. 26:17-25.  McDonald got the letter because Bravo requested that Lucas work in AI and Lucas refused.  <u>Id.</u> at ¶20.

  C. <u>July 17, 2007</u>

  Lucas met with Evans and Liburd on July 17, 2007. <u>Id.</u> at ¶22. This meeting was prompted because Evans had been trying to reach Lucas and the letter she had sent was returned unclaimed. <u>Id.</u> at ¶23.  During this meeting, Lucas claims that Evans was hostile because of her demeanor, but he could not recall anything that she said. <u>Id.</u> at ¶24. Lucas alleges that Liburd said at the end of the meeting, "[I]f I was harassing you, you wouldn't be here." <u>Id.</u> at ¶25. Lucas testified, "What Mr. Liburd was referring to, if I was harassing you, you wouldn't be here, meaning that if I was harassing you, you'd be fired." <u>Id.</u> at ¶26. Lucas was not fired from the Postal Service; he quit. <u>Id.</u> at ¶27.

  D. <u>Form CA-17</u>

  Lucas alleges that Evans requested updated medical paperwork, referred to as a Form CA-17, from him. <u>Id.</u> at ¶28. A Form CA-17 is requested every 30 days and it informs management of the employee's restrictions and limitations. <u>Id.</u> at ¶29. Evans, and management in general, does not determine when a Form CA-17 is due; the Form CA-17 is requested by the Postal Service's

Injury Compensation Unit and management follows the Injury
Compensation Unit's lead. Id. at ¶30.  As of July 20, 2007, Lucas
had not provided Evans, and the Injury Compensation Unit, with
the necessary documents. Id. at ¶31. No one else in Evans's pay
location, including George Szalaty, failed to turn in the CA-17
forms. Id. at ¶32.[2]

Lucas testified that in 2006 Evans left one of Lucas' Form
CA-17s in the cafeteria. Id. at ¶33. Lucas stated that he does
not know the details of how the form was left in the cafeteria.
Id. at ¶34. Lucas complained to Liburd but he does not know if
Liburd did anything. Id. at ¶35. Evans explained what happened
regarding Lucas' Form CA-17, stating: "I went to my mailbox,
pulled out my mail, went down to get a cup of coffee in the
cafeteria, unbeknownst to me that that was in it, and it was left
there. It was addressed by my MDO and Mr. Lucas together. And it
hasn't happened since." Id. at ¶36.

E.   July 20, 2007

On July 20, 2007, Lucas alleges that Liburd instructed him

_____

[2]Plaintiff denied the facts in paragraphs 31 and 32 in his
56(a)(2) Statement; however, plaintiff failed to comply with
Local Rule 56(a)(3), which states that an opponent's denial in a
Local Rule 56(a)(2) Statement "must be followed by a specific
citation to (1) the affidavit of a witness . . . and/or (2)
evidence that would be admissible at trial." Plaintiff's denials
of ¶¶31 and 32 contain no citation and, in the case of ¶31, no
explanation for the objection whatsoever. Therefore, the court
shall deem admitted ¶¶31 and 32 in accordance with Local Rule
56(a)(3), as "failure to provide specific citations to evidence
in the record as required by this Local Rule may result in the
Court deeming certain facts that are supported by the evidence
admitted in accordance with Rule 56(a)(1) . . . ." D. Conn. L.
Civ. R. 56(a)(3).

to work on Netflix mail, damaged mail from the Netflix company
that had to be repaired before it could continue its journey.
Id. at ¶37. Lucas alleges that Bravo approached him and
instructed him to go to AI. Id. at ¶37. When Lucas responded that
Liburd instructed him to work on Netflix, Lucas alleges that
Bravo then became belligerent and irate. Id. at ¶38. Lucas does
not recall whether Bravo had ever done anything discriminatory or
retaliatory prior to July 20, 2007. Id. at ¶39. When asked at his
deposition, "Why did you perceive Ms. Bravo's behavior to be
discriminatory or retaliatory? What about it made you think
that?" Lucas answered, "The way I was approached." Id. at ¶40.
Lucas continued to work on Netflix and Bravo went to get
McDonald. Id. at ¶41.

Evans explained what should have happened in a situation
like this in her deposition.

> Q:   (By Attorney Glen) Sure. Say the MDO says, "Go to AI."
>      The SDO says, "We have a need elsewhere," and the
>      employee, presumably, just for purposes of my question,
>      says, "Hey, I was told by the MDO to do this." And my
>      earlier question was how was that discrepancy resolved?
>      You said it's based upon need?
> A:   Right.
> Q:   Does the SDO go to the MDO and say, "Look, I need so
>      and so here today," and it's resolved that way? Is that
>      ever cleared in that fashion?
> A:   Yes, it is.
> Q:   Is that the typical protocol?
> A:   Yes.
> Q:   And that's what supposed to be done when there is such
>      a discrepancy?
> A:   It can be done either way if you need them.
> Q:   What other ways can it be done?
> A:   *You can take them to where they need to go, where
>      they're needed, and then you inform the MDO that that's
>      what needed to be done at that time.*
> Q:   The MDO [sic] is not beholden to where the initial

10

> assignment is or should have been based upon the MDO's directive?
>
> A:   *No, it was the need. Where the needs of the mail is needed, you can remove someone. It's just informing them. It's just communication that's needed.*
>
> Q:   But however done, the MDO is informed one way or the other?
>
> A:   One way or the other, yeah.

Id. at ¶42 (emphasis added).

McDonald came over to speak with Lucas and McDonald was neither hostile nor aggressive towards Lucas. Id. at ¶43.  Lucas asked McDonald to let him go home and Lucas went home.[3] Id. at ¶44.

F.   Denial of Sick Leave

On July 20, 2007, Lucas left work early and requested sick leave.[4] Id. at ¶45.  Lucas alleges that he was denied sick leave for that day and the following days. Id. at ¶46.  Evans required him to submit documentation because, according to the Employee and Labor Relations manual, commonly referred to as the ELM, documentation was required for absences longer than three days. Id. at ¶47. Approximately one month later, Lucas submitted the required documentation, a pay adjustment was made, and Lucas was paid for his time. Id. at ¶48.

Lucas alleges that on October 16, 2007, he went to work to

---

[3]The Court notes that plaintiff alleges in his Complaint that he "had no problem working in the Automatic Induction area but, once again, it was the abusive manner in which he was approached and treated, which was both hostile and demeaning." Compl. ¶7(f)

[4]Plaintiff alleges that he "became so stressed he requested permission to go home."  Compl. ¶7(f).

provide updated documentation regarding his work status and Evans confronted him in the parking lot and asked him, "[W]here do you live?!" Id. at ¶49. Evans' contact with Lucas on October 16, 2007 was a chance encounter. Id. at ¶50.  Evans asked Lucas for information and Lucas did not respond. Id. at ¶51. Evans asked Lucas for this information because the letters she sent him were returned unclaimed. Id. at ¶52.

     G.   Plaintiff's Resignation

Lucas did not report to work at the Postal Service after July 20, 2007. He resigned on January 17, 2008. Id. at ¶53.

The following colloquy occurred during Lucas's deposition:

> Q:  Do you attribute the retaliation in this case because you were on medical leave?
> A:  Could you rephrase that?
> Q:  Sure. I know that we've talked about these incidents that you consider to be retaliation, and it's the same incidents that we talked about for discrimination. What I want to make sure I understand is do you think the people and the incidents that we talked about, do you think they were motivated to retaliate against you - do you claim they were motivated to retaliate against you because you were on medical leave?
> A:  Are you saying that's the sole reason?
> Q:  Do you think that's the one of the reasons? I mean, do you think there are multiple reasons?
> A:  My color.
> Q:  So, you think it would be - well, let me ask you this, make sure I understand. *Do you think it's because you filed that prior EEO complaint?*
> A:  *I'm not sure.*

Id. at ¶54 (emphasis added).

Lucas saw William Hendrixson, APRN, MSN, BC, from July 2, 2007 to March 3, 2008. Id. at ¶55. Lucas testified that Hendrixson told him to resign from the Postal Service. Id. at ¶56. Hendrixson did not tell Lucas to resign; rather, he

presented Lucas with pros and cons of the options and let Lucas
make the decision. Id. at ¶57. Hendrixson's notes reflect that on
December 20, 2007, Lucas told Hendrixson that Lucas planned to
discuss with his attorney the idea of resigning from the Postal
Service. Id. at ¶58. During the deposition of Hendrixson, the
following colloquy occurred regarding Lucas's treatment:

> Q:   (By Attorney Glenn) Did he ever indicate that he
>      thought the harassment, in addition to potentially
>      being related to his injury and his assignment at the
>      time, did he ever indicate that he felt that race was
>      playing a part in his treatment that you recall?
> A:   No.

Id. at ¶59.

At no point after being asked numerous times during
discovery and in his deposition to list all incidents of
discrimination did Lucas ever indicate that anyone had called him
any derogatory names.  Id. at ¶60.


DISCUSSION

Plaintiff alleges that the Postal Service discriminated
against him in violation of Title VII of the Civil Rights Act of
1964, 42 U.S.C. §2000e et seq. ("Title VII"), on the basis of his
race (African-American), and color (black), retaliated against
him based on a protected activity and constructively discharged
him.[5]  Title VII: Disparate Treatment

_____

[5]In Count One, plaintiff alleges disparate treatment and a
hostile work environment based on his race and color. In Count
Two, plaintiff alleges retaliation, and in Count Three he alleges
constructive discharge.

13

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).

To establish a prima facie discriminatory treatment case based on an adverse employment action, a plaintiff must show "1) that he belonged to a protected class; 2) that he was qualified for the position he held; 3) that he suffered an adverse employment action; and 4) that the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004) (citing Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002)).

"An 'adverse employment action' is one which is 'more disruptive than a mere inconvenience or an alteration of job responsibilities.'" Id. (quoting Galabya v. New York City Bd. of Educ., 202 F .3d 636, 640 (2d Cir. 2000)). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." Feingold, 366 F.3d at 152 (internal quotation marks and alterations omitted). An adverse employment action "may or may not entail economic loss, but there must be a link between the discrimination and

14

some 'tangible job benefits' such as 'compensation, terms, conditions or privileges' of employment." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002)(quoting Karibian v. Columbia Univ., 14 F.3d 773, 778 (2d Cir. 1994)). Plaintiff's burden at this stage of the analysis is "minimal." Byrnie v. Town of Cromwell Bd. of Educ., 243 F.3d 93, 101 (2d Cir. 2001).

"Once a plaintiff has made out a prima facie case, the employer is required to offer a legitimate, nondiscriminatory business rational for its conduct." Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)); Stern v. Trustees of Columbia University in City of New York, 131 F.3d 305, 312 (2d Cir. 1997) ("defendant has the burden of producing, through the introduction of admissible evidence, reasons for its actions, which if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action."). If defendant states a neutral reason for the adverse action, "to defeat summary judgment . . . the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination." Stern, 131 F.3d at 312; Howley v. Town of Stratford, 217 F.3d 141, 150 (2d Cir. 2000). A neutral reason "cannot be proved to be a 'pretext for discrimination' unless it is shown both that the reason was false, and that discrimination was the real reason." St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (emphasis in

original). In other words, the plaintiff must offer proof "through presentation of his own case and through cross-examination" that would allow a rational fact finder to conclude that the proffered reason was not the true reason for the adverse employment action. Carlton, 202 F.3d at 135 (internal citation omitted).

Defendant does not contest that plaintiff established the first two prongs of his prima facie case of disparate treatment under Title VII as plaintiff is a black (color) African-American (race) and he was qualified for his position. Defendant argues, however, that plaintiff fails to establish that the Postal Service's temporary denial of sick leave constitutes an adverse employment action that satisfies the third element of plaintiff's prima facie case.  Nor can plaintiff establish under the fourth element that the adverse employment action, if shown, occurred under circumstances giving rise to an inference of discriminatory intent.

"Lucas maintains that he sustained an adverse employment action flowing from USPS management logging his legitimate absences from work as either AWOL or LWOP." [Doc. #26 at 10]. It is undisputed that the Postal Service asked Lucas to turn in the required paperwork to have his absences count as sick time. Def. 56(a)(1) Stat. ¶47. The requirement to provide medical documentation for absences longer than three days is set forth in the Employee and Labor Relations manual.  Id.  Lucas failed to turn in the paperwork until one month later.  Id. ¶48. This was

16

the reason why the Postal Service did not give Lucas sick leave. After the paperwork was submitted, a pay adjustment was made and Lucas was paid for his time.  <u>Id.</u>

Because the failure to grant sick leave is directly attributable to Lucas' failure to provide medical documentation required by the Employee and Labor Relations manual, the temporary denial of sick leave was not a materially adverse action.

To support his contention that charging him with AWOL or LWOP was a materially adverse action, plaintiff cites the testimony of floating Supervisor of Distribution Operations ("SDO")  Joe McDonald. He argues that "a record of absenteeism impacts how an employee is viewed by management concerning reliability and any prospects of promotion."  Pl. Ex. C at 73-74. However, this argument is problematic in several respects. McDonald testified that whether an employee's absence impacted how a supervisor viewed the reliability of an employee would depend on why they are absent; he testified that he did not conduct performance reviews of plaintiff, and that performance reviews are not conducted for plaintiff's position in the mail handlers class.  <u>Id.</u>  Accordingly, plaintiff's argument that he "sustained an adverse employment action" when the Postal Service temporarily designated his absences from work as other than sick time is not availing.

Finally, even if plaintiff could show he sustained an adverse employment action, he has not shown that "the adverse

employment action occurred under circumstances giving rise to an inference of discriminatory intent." Feingold v. New York, 366 F.3d 138, 152 (2d Cir. 2004). There is simply no evidence to support such an inference.

Plaintiff also alleges that the Postal Service "was not evenhanded in its request to cover other limited duty assignments."  [Doc. #26 at 10-11]. Lucas contends that George Szalaty and Teodore Cristescu, white/Caucasian male mail handlers who also suffered workplace injuries, "routinely refused to meet operational needs with USPS assent." [Doc. #26 at 10].  Plaintiff argues that this is evidence of disparate treatment.

A plaintiff may raise an inference of discriminatory intent by showing that the employer treated him less favorably than a similarly situated employee outside his protected group. Lee v. Connecticut, 427 F. Supp. 2d 124, 131 (D. Conn. 2006) (citing Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir.2000)). To be similarly situated, the individuals with whom the plaintiff attempts to compare himself must be similarly situated "in all material respects." Shumway v. United Parcel Serv., Inc., 118 F.3d 60, 64 (2d Cir. 1997) (citing Mitchell v. Toledo Hosp., 964 F.2d 577, 583 (6th Cir. 1992)).

"What constitutes 'all material respects' . . . must be judged based on (1) whether the plaintiff and those he maintains were similarly situated were subject to the same workplace standards and (2) whether the conduct for which the employer imposed discipline was of comparable seriousness . . . . Hence

18

the standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than showing that both cases are identical." <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 40 (2d Cir. 2000) (internal citations omitted).

While it is true that Lucas, Szalaty and Cristescu's workplace injuries were accepted by the Office of Worker's Compensation and all three were extended an Offer of Modified Assignment by the Postal Service, [Pl. 56(a)(2) Stat. ¶¶1-2], comparators Szalaty and Cristescu differ because they were classified as permanent light duty status, Pl. Ex. E at 40; and permanent limited duty status, respectively. Pl. Ex. L at 9. Lucas admits that Szalaty and Cristescu were not similarly situated comparators and he does not establish that all three men had similar injuries with similar restrictions.[6] Szalaty testified that he was unable to work in Automated Induction ("AI") and Cristescu was restricted to working rewrap only, [Pl. Ex. E at 31], whereas, Lucas admitted he could work in the AI area. [Doc. #26 at 9]. Both Szalaty and Cristescu testified that the Postal Service requested they cover other duty assignments. Szalaty testified that he had worked in other areas at the discretion of management but was limited in what he could do because of the nature of his injuries.  Pl. Ex. E at 33-36

---

[6] Plaintiff states that Szalaty's limited duty assignment was based on carpal tunnel syndrome and a back injury.  Pl. 56(a)(2) Stat. ¶¶16-17.  Cristescu testified he suffered from a back injury.  Pl. Ex. L at 8.

(working in scanning and rewrap, unable to work at AI or stripping). Cristescu testified that management asked him to work in sleeving for one week under the presumption that it was limited-duty work but he was unable to do the work without pain and was returned to rewrap.  Pl. Ex. L 24-25.

Both Szalaty and Cristescu testified that they were required by the Postal Service to submit medical documentation when they were placed on light duty and limited duty status. [Pl. Ex. E at 39-41] (Szalaty testifying he submitted medical documentation every twenty-eight to thirty days); [Pl. Ex. L at 29]. (Cristescu testifying he was required to provide medical documentation). Szalaty was asked: "whether it's Sue Nolan, or other management officials, did you ever have the sense that management was unnecessarily requesting your medical documentation while you were on limited duty?" He answered, "Well, you feel that way because it's a pain." [Pl. Ex. E at 42].  On this record, Lucas has not shown that the Postal Service treated him less favorably than a similarly situated employee outside his protected group. Accordingly, Szalaty and Cristescu are not proper comparators.

Even if Szalaty or Cristescu were comparators, Lucas provides no evidence to support a disparate treatment claim. Lucas suffered no discipline from the incidents; thus he cannot show he sustained an adverse employment action. Nor has Lucas shown that the Postal Service's request to work in AI or to submit a Form CA-17 was done under circumstances giving rise to an inference of discrimination. The Postal Service requested that

Lucas, Szalaty and Cristescu try other light duty assignments and all three testified that they were required to provide the same medical documentation. It is undisputed that the request to provide a CA-17 medical documentation form was required by the Postal Service's Injury Compensation Unit. Def. 56(a)(1) ¶¶28-30. There is no evidence Lucas as singled out on the basis of his race or color to provide a Form CA-17.  Indeed, there is no evidence that the requests to work in different areas had any effect on Lucas' employment other than his assignment for those shifts. Lucas' complaints do not rise to the level of adverse employment actions and, as set forth below, he has not shown that the Postal Service's acts were so severe or pervasive as to be considered a hostile work environment.

Accordingly, summary judgment is **GRANTED** to defendant on plaintiff's disparate treatment claim.

Title VII: Hostile Work Environment

As set forth in the Complaint, plaintiff's hostile work environment claims comprise the same allegations he complains of as disparate treatment. Plaintiff states he was "repeatedly and unnecessarily harassed for medical documentation embodied in USPS Form CA-17" and requested to work in other areas "based upon operational needs." [Doc. #26 at 11-13].

A hostile work environment exists in violation of Title VII when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

21

abusive working environment. <u>Harris v. Fork Lift Sys., Inc.</u>, 510 U.S. 17, 20 (1993). To prevail on a hostile work environment claim, plaintiff must show both (1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the condition of his employment, and (2) that a specific basis exists for imputing to the employer the conduct that created the hostile environment. <u>Briones v. Runyon</u>, 101 F.3d 287, 291 (2d Cir. 1996). Relevant factors include the (1) frequency of the discriminatory conduct, (2) the severity of the conduct, (3) whether it is physically threatening or merely an offensive utterance, and (4) whether it unreasonably interferes with an employee's work performance. <u>Harris</u>, 510 U.S. at 23. A hostile work environment claim is subject to both subjective and objective measurement: a plaintiff must demonstrate that he personally considered the environment hostile, and that the environment rose to some objective level of hostility. <u>Leibovitz v. New York City Transit Auth.</u>, 252 F.3d 179, 188 (2d Cir. 2001).

Isolated remarks or occasional episodes of harassment will not merit relief under Title VII; the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive. <u>See</u> <u>Petrosino v. Bell Atlantic</u>, 385 F.3d 210, 223 (2d Cir. 2004). However, one act that is sufficiently severe may alter the plaintiff's conditions of employment without repetition. <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2d Cir. 1998), abrogated on other grounds, <u>Nat'l R.R. Passenger</u>

Corp. v. Morgan, 536 U.S. 101 (2002).

Here plaintiff returned to work on July 13, 2007, after sustaining a work-related injury.[7] Compl. ¶6.  The allegedly hostile incidents, such as the request to work in another work station or to provide medical documentation or an updated home address, cannot be deemed severe, hostile or pervasive. Moreover, plaintiff has failed to show that any of the allegedly hostile acts were motivated by his color/race.  Lucas admitted that no one called him any derogatory names.  Def. 56(a)(1) Stat. ¶60.

Accordingly, there is no evidence to support the finding that plaintiff was subjected to a hostile work environment

---

[7]The Complaint alleges the incidents comprising the hostile work environment occurred on July 16, 17 and 20, and October 16, 2007. Specifically, he alleges that on July 16, 2007, MDO McDonald asked him to work in AI. On July 17, 2007 SDO Evans and Lead MDO Liburd "wanted to discuss work modifications and a letter requesting a medical update," or Form C-17. Compl. ¶7(d). Plaintiff alleges that on July 20, 2007, Lead MDO Liburd instructed him to work "Netflix" and later instructed Lucas to work AI. He alleges that he "became so stressed he requested permission to go home." Compl. ¶7(f).  Finally, he alleges that on October 16, 2007, he dropped off his updated medical documentation at the Post Office and SDO Evans approached him in the parking lot and asked him where he lived. Compl. ¶7(h). Plaintiff resigned his employment on January 17, 2008.

Plaintiff's brief in opposition to summary judgment alleges that the incidents comprising the hostile work environment occurred on July 16, and 20, 2007, when he was asked to work another work assignment "based on operational needs." [Doc. #26 at 12].

To the extent that plaintiff did not address other potential incidents alleged in the Complaint, the Court finds those arguments waived for failure to raise them in opposition to summary judgment. C.A, Inc. v. Simple.com. Inc., No. 02 Civ. 2748(DRH)(MLO), 2009 U.S. Dist. LEXIS 25240, *66-69 (E.D.N.Y. Mar. 5, 2009) (waiver if issue not addressed by opposition to summary judgment).

permeated with discriminatory intimidation sufficiently severe or pervasive to alter the condition of his employment. Summary judgment is **GRANTED** in defendant's favor on plaintiff's hostile work environment claim.

Title VII: Retaliation

Title VII prohibits retaliation against employees who initiate or participate in a proceeding or investigation that claims their employer violated Title VII. 42 U.S.C. § 2000e-3(a). Under the McDonnell Douglas burden-shifting framework, Lucas must first demonstrate a prima facie case of retaliation. See Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).

To establish a prima facie case of retaliation under Title VII, a plaintiff is required to show by a preponderance of the evidence that: (1) he participated in a protected activity, (2) the defendant knew of the protected activity; (3) he experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action. Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001). Title VII's "anti-retaliation provision protects an individual not from all retaliation, but from retaliation that produces an injury or harm." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 67, (2006). This is an objective standard: "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Id. at 68 (quotation

24

marks omitted). Furthermore, the Court cautioned that "normally petty slights, minor annoyances, and simple lack of good manners" in the workplace fall short of this standard. Id. If a plaintiff meets his minimal prima facie burden and the defendant counters with legitimate justifications for its actions, then the plaintiff must show that the proffered reasons are merely pretextual. Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1181 (2d Cir. 1996).

Defendant does not dispute that Lucas has established the first and second elements of a prima facie case of retaliation. Plaintiff filed a charge of discrimination on September 6, 2007, with the Equal Employment Office and the Postal Service, and defendant responded to the charges. Compl. ¶¶9, 15. The third element, "adverse employment action," is disputed. To satisfy the third element, that Lucas suffered an adverse employment action, "plaintiff must show that a reasonable employee would have found the challenged action materially adverse which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern and Santa Fe Ry. Co., 548 U.S. 68 (internal quotation marks and citation omitted, emphasis added). In distinguishing "material adversity" from "trivial harms," the Supreme Court explained that "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." Id. (citation omitted).

Plaintiff first claims that the Postal Service retaliated against him for complaining about harassment by requiring him to provide medical documentation for his absence from work.  As set forth above, plaintiff's absence from work for more than three days triggered the Postal Service's requirement for medical documentation by completing Form CA-17. Postal Service management does not determine when a CA-17 is required; the CA-17 is requested by the Postal Service's Injury Compensation Unit and the Employee and Labor Relations manual ("ELM") for absences longer than three days.  Def. 56(a)(1) ¶¶30, 47.  No other employees, including plaintiff's comparator employees George Szalaty and Teodor Cristescu, failed to submit the CA-17 forms. Def. 56(a)(1) ¶32, Cristescu Depo. at 29.

On July 20, 2007, plaintiff left work early and requested sick leave. Plaintiff's supervisor Evans required him to submit documentation in accordance with the Employee and Labor Relations manual. Approximately one month later, after Lucas submitted the medical documentation, a pay adjustment was made and he was paid for his time.  Def. 56(a)(1) ¶48.  Plaintiff's failure to submit the CA-17 was the uncontroverted reason why the Postal Service did not provide him with paid sick leave.  At worst, having to document his absence was a trivial workplace annoyance, not an adverse employment action. "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Feingold v. New York</u>, 366 F.3d 138, 152 (2d Cir. 2004) (internal quotations and citations

26

omitted)). "Examples of materially adverse employment actions
include termination of employment, a demotion evidenced by a
decrease in wage or salary, a less distinguished title, a
material loss of benefits, significantly diminished material
responsibilities, or other indices unique to a particular
situation." Id. (internal quotations and citations omitted).
Plaintiff filed a discrimination complaint with the Postal
Service and EEO on September 7, 2007, after he submitted his
medical documentation and after he was paid.

Plaintiff also claims that the Postal Service retaliated
against him for complaining about harassment by requiring him to
work in AI. As set forth above, Lucas admitted that his modified
work assignment permitted him to work in AI, def. 56(a)(1) ¶18,
and he has not shown that this assignment had any negative
employment consequences.  Following the assignment to work in AI
on July 20, 2007, plaintiff left work for the day and never
returned to work, resigning in January 2008.

Lucas alleges none of the prototypical examples of adverse
employment actions, such as termination, demotion, decrease in
salary, change in job title, loss of benefits, or reduced
responsibilities. As seen in Burlington Northern, these factors
are not necessarily dispositive of a retaliation claim.
Nonetheless, the Plaintiff has the burden of showing that a
"reasonable employee" would have found the challenged action
materially adverse. On this record, the Court can find none of
the incidents Lucas asserts, as a matter of law, to be adverse

27

employment actions, or within the category of actionable harm
described in Burlington Northern.

Finally, Lucas has not satisfied the fourth element, which
requires him to demonstrate a causal connection between his
protected activity and the adverse action. To establish the
fourth element, Lucas must put forth evidence of retaliatory
animus or motive. "For purposes of establishing a prima facie
case, Title VII of the 1964 Civil Rights Act is violated when a
retaliatory motive plays a part in adverse employment actions
toward an employee, whether or not it was the sole cause."
Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir.
1993) (citations omitted).

Quite simply, Lucas offered no evidence that the requests to
file a CA-17 or to work in AI were linked to his September 7,
2007, discrimination complaint.  "[P]roof of causation can be
shown either: (1) indirectly, by showing that the protected
activity was followed closely by discriminatory treatment, or
through other circumstantial evidence such as disparate treatment
of fellow employees who engaged in similar conduct; or (2)
directly, through evidence of retaliatory animus directed against
the plaintiff by the defendant." Gordon v. New York City Bd. of
Educ., 232 F.3d 111, 117 (2d Cir. 2000) (citing Cosgrove, 9 F.3d
at 1039). As to the indirect method of proving causation, there
is no temporal link here. The request for a CA-17 and
reassignment to AI occurred nearly two months before Lucas filed
a complaint with the Postal Service and EEO.  Lucas has not

pointed to any incidence of protected activity that is temporally proximate to the request for CA-17 and/or reassignment to AI. Nor is there evidence in the record regarding disparate treatment of fellow employees who engaged in similar conduct. As previously discussed, both Szalaty and Cristescu were required to file CA-17 forms and were reassigned from time to time.

As to the direct method of proving causation, Lucas has not offered any evidence of retaliatory animus on the part of the Postal Service. Plaintiff has not set forth any facts supporting a conclusion that the requirement to file Form CA-17 and/or the work reassignment was motivated by anything other than Postal Service policy and/or a good faith belief that plaintiff was physically able to work in AI, a work assignment that plaintiff admits he was able to do.

Even assuming that Lucas made out a prima facie case of retaliation, the Postal Service articulated a legitimate reason for its actions and Lucas has not offered any evidence that the proffered reason was pretextual. McDonald, Evans and Bravo were not even responsible for the request for the Form CA-17; they were carrying out the instructions of the Postal Injury Compensation Unit,  Def. 56(a)(1) ¶¶28-30.

Accordingly, summary judgment is **GRANTED** to defendant on plaintiff's retaliation claim.

Constructive Discharge

Finally, Lucas claims constructive discharge.

"An employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily ." Terry v. Ashcroft, 336 F.3d at 151-52 (2d Cir. 2003). Whether working conditions rise to this level generally depends on two inquiries: "the employer's intentional conduct and the intolerable level of the work conditions." Petrosino v. Bell Atlantic, 385 F.3d 210, 229 (2d Cir. 2004). The first inquiry may be satisfied by proof that "employers acted with the specific intent to prompt employees' resignations," and the second inquiry "is assessed objectively by reference to a reasonable person in the employee's position." Id. at 229-30.  "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the employee to quit."  Leson v. ARI of Connecticut, Inc., 51 F. Supp. 2d 135, 143 (D. Conn. 1999) (quotation marks and citation omitted).

Lucas has not demonstrated that the Postal Service acted with the specific intent to prompt his resignation. At the time he resigned, Lucas had not reported to work at the Postal Service for almost six months.  Def. 56(a)(1) Stat. ¶53.  Plaintiff left work on July 20, 2007 and resigned his employment on January 17, 2008.  Id.  On December 20, 2007, plaintiff told his therapist that he was going to speak with his attorney about resigning from the Postal Service. Def. 56(a)(1) ¶58.  Lucas made the decision to resign in consultation with his therapist and attorney after a

significant absence from work. Id.  The Court finds that Lucas'
resignation came too late after the allegedly offensive conduct
to support a claim of constructive discharge.  "If a plaintiff
does not resign within a reasonable time period after the alleged
harassment, he was not constructively discharged." Landrau-
Romero v. Banco Popular De Puerto Rico, 212 F3d 607, 613 (1st
Cir. 2000) (citing Smith v. Bath Iron Works Corp., 943 F.2d 164,
167 (1st Cir. 1991) (no constructive discharge found where
plaintiff quit six months after last reported incident of sexual
harassment)).  Here, Lucas has not adduced evidence of any
incidents of mistreatment within a reasonable time of his
resignation in January 2008.  The specific events to which he
affixed dates occurred no later than July 2007, when he left the
job.[8]

Finally, based on the conclusion above that Lucas' hostile
work environment claim fails as a matter of law, it follows that
his constructive-discharge claim fails as well: under either
theory, a plaintiff must show that the disparate treatment or
harassment "occurred in circumstances giving rise to an inference
of discrimination on the basis of [his] membership" in a
protected class. Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d
81, 91 (2d Cir. 1996).

Accordingly, Lucas has failed to provide sufficient evidence

---

[8]Lucas alleges that on October 16, 2007, he went to work to
provide updated medical documentation regarding his work status
and Evans approached him in the parking lot and asked, "[W]here
do you live?" Def. 56(a)(1) ¶49. Evans testified that she asked
Lucas for this information because the letters she had sent him
were returned unclaimed.  Id. ¶52.

to raise an issue of fact as to whether he was constructively discharged. Summary judgment is **GRANTED** to defendant on this claim.

<u>CONCLUSION</u>

For the foregoing reasons, defendant's Motion for Summary Judgment **[Doc. #20]** is **GRANTED**.[9]

SO ORDERED at Bridgeport this 11th day of January 2010.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE

---

[9]This is not a recommended ruling.  The parties consented to proceed before a United States Magistrate Judge [Doc. #17] on January 21, 2009, with appeal to the Court of Appeals.